UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | | |
|---|---|---|
| IN RE: WESTERN STATES WHOLESALE NATURAL GAS ANTITRUST LITIGATION | ) ) ) | MDL 1566 2:03-CV-01431-PMP-PAL BASE FILE |
| _____ | ) | |
| | ) | |
| HEARTLAND REGIONAL MEDICAL CENTER, et al., | ) ) | 2:07-CV-00987-PMP-PAL |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | ORDER RE: DEFENDANT'S MOTION TO DISMISS (Doc. #1299) |
| | ) | |
| ONEOK, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Presently before this Court is Defendant Duke Energy Carolinas, LLC's Motion to Dismiss Plaintiffs' Amended Complaint for Damages for Lack of Personal Jurisdiction (Doc. #1299).[1]  Plaintiffs filed an Opposition (Doc. #1458) and supporting exhibits (Doc. #1459, #1471).  Defendant filed a Reply (Doc. #1487).

I.       **BACKGROUND**

   **A.  Procedural Background**

   This case is one of many in consolidated Multidistrict Litigation arising out of the energy crisis of 2000-2001.  Plaintiffs originally filed the above action in the Circuit Court of Buchanan County, Missouri.  (Notice of Removal, Compl. [2:07-CV-00987-PMP-PAL, Doc. #1].)  Defendants removed the case to the United States District Court for the Western District of Missouri.  (Id.)  The Judicial Panel on Multidistrict Litigation entered a Transfer

_____

[1] Document numbers refer to the base file, 2:03-CV-01431-PMP-PAL, unless otherwise noted.

Order pursuant to 28 U.S.C. § 1407 centralizing the foregoing action in this Court for coordinated or consolidated pretrial proceedings.  (Conditional Transfer Order [2:06-CV-1351-PMP-PAL, Doc. #8].)

In this litigation, Plaintiffs seek to recover damages on behalf of natural gas rate payers.  In the Complaint, Plaintiffs allege Defendants engaged in anti-competitive activities with the intent to manipulate and artificially increase or control the price of natural gas for consumers.  (Am. Compl. (Doc. #1260) at 28-37.)  Specifically, Plaintiffs allege Defendants knowingly delivered false reports concerning trade information and engaged in wash trades, in violation of Missouri Antitrust Law, R.S. Mo. § 416.010, et seq. (Id.)

Plaintiffs Heartland Regional Medical Center and Prime Tanning Corp. are Missouri non-profit companies with their principal places of business in Missouri.  (Id. at 3.)  Plaintiffs allege they purchased natural gas directly from one or more Defendants, and from other natural gas sellers in the State of Missouri, during the past six years.  (Id.) According to the Complaint, Defendants are natural gas companies that buy, sell, transport, and store natural gas, including their own and their affiliates' production, in the United States and in the State of Missouri.  (Id. at 3-27.)

The Amended Complaint's allegations are directed generally at two types of Defendants: the natural gas companies that actually engaged in natural gas sales and the related reporting of allegedly manipulated gas prices to the trade indices, and those companies' parent corporations.  The Amended Complaint does not allege the parent company Defendants themselves engaged in natural gas trading and price reporting. Rather, the Amended Complaint alleges these Defendants are the parent companies of subsidiaries which engage in such activity generally, and which also made natural gas sales in Missouri during the relevant time period.

///

Plaintiffs seek to establish personal jurisdiction over the parent company Defendants based on their out-of-forum activities directed at Missouri along with their subsidiaries' and affiliates' contacts within Missouri.  According to the Amended Complaint, the parent company Defendants dominated and controlled their respective subsidiaries and the parent company Defendants "entered into a combination and conspiracy . . . which tended to prevent full and free competition in the trading and sale of natural gas, or which tended to advance or control the market prices of natural gas." (Id. at 3, 6, 10, 12, 14, 16, 18, 22, 24-25.)  Plaintiffs allege the parent company Defendants intended their actions to have a direct, substantial, and foreseeable effect on commerce in the State of Missouri.  (Id. at 4, 6, 10, 12, 14-16, 18, 22, 24-25.)  According to the Amended Complaint, the parent company Defendants "made strategic marketing policies and decisions concerning natural gas and the reporting of natural gas trade information to reporting firms for use in the calculation of natural gas price indices that affected the market prices of natural gas, and those policies and decisions were implemented on an operational level by affiliates . . . in the United States and in Missouri." (Id. at 4, 7, 10-11, 13, 15-16, 19, 22, 24-26.)

Defendant Duke Energy Carolinas, LLC ("DEC") now moves to dismiss, arguing this Court lacks personal jurisdiction over it.  According to DEC, it conducts no business in Missouri and has no other contacts supporting general or specific jurisdiction.  DEC also argues it cannot be subject to jurisdiction in Missouri based on its subsidiary's contacts with the forum because its subsidiary is not its agent or alter ego.  DEC thus argues exercising personal jurisdiction in this case would violate constitutional due process requirements.

Plaintiffs respond that DEC's subsidy has submitted to jurisdiction in Missouri and DEC is subject to personal jurisdiction through agency and alter ego principles based on its subsidiary's contacts with the forum.  Additionally, Plaintiffs request the Court to delay ruling on the jurisdictional question until merits discovery is completed because the

1   jurisdictional questions are intertwined with the merits.

2   **B. Facts Related to Personal Jurisdiction**

3   DEC is a North Carolina limited liability company formerly known as Duke

4   Energy Corporation, a North Carolina corporation.  (Renewed Mot. to Dismiss for Lack of

5   Pers. Juris. (Doc. #872) ["DEC Mot."], Ex. A at 2.)  Duke Energy Corporation converted to

6   a limited liability company and renamed itself DEC in April 2006.  (Id.)  DEC primarily

7   engages in the business of generating, transmitting, distributing, and selling electric energy

8   in North and South Carolina.  (Id. at 3.)

9   DEC does not maintain offices, conduct business, have employees, own property,

10  pay taxes, or maintain a bank account in Missouri.  (Mot. to Dismiss for Lack of Pers. Juris

11  (Doc. #1299) ["DEC Heartland Mot."], Ex. A at 1, Ex. B at 2.)  DEC has not purchased,

12  sold, or transported natural gas in Missouri.  (DEC Heartland Mot., Ex. C at 2.)  DEC has

13  not applied for or received a certificate of authority to transact business in Missouri and has

14  no registered agent for service of process in Missouri.  (DEC Heartland Mot., Ex. E at 2.)

15  DEC wholly owns Duke Capital Corporation, which in turn wholly owns Pan

16  Energy Corp.  (App. to Pls.' Joint Opp'n to Duke Energy Carolinas, LLC's Mot. to Dismiss

17  for Lack of Pers. Juris. (Doc. #1084) ["Pls.' App."], Ex. F.)  Pan Energy Corp. wholly owns

18  Duke Energy Services, Inc., which wholly owns Duke Energy Natural Gas Corporation.

19  (Id.)  Duke Energy Natural Gas Corporation wholly owns DETMI Management, Inc.  (Id.)

20  DETMI Management, Inc. owns a sixty percent interest in Duke Energy Trade and

21  Marketing, LLC ("DETM"), a Defendant in this action and the subsidiary whose contacts

22  with Missouri Plaintiffs seek to attribute to DEC.  (DEC Mot., Ex. C at 2.)  Mobil Natural

23  Gas, Inc. ("MNGI"), an indirect subsidiary of Exxon Mobil Corporation, owns the other

24  forty percent of DETM.  (Id. at 2-3.)

25  ///

26  ///

1    DETM was created in 1996 as a Delaware limited liability company pursuant to a

2    limited liability company agreement and limited partnership agreement.  (Pls.' App., Ex. E

3    at 34-35; App. of Docs. Filed Under Seal (Doc. #1125) ["Sealed App."], Ex. L at

4    DEMDL000383; Separate Vol. of Evid. in Supp. of the Separate App. of Facts Regarding

5    Duke Energy Carolinas, LCC (Doc. #968) ["Separate Vol. Evid."], Ex. 7.)  The company

6    now known as DETM originally was called PanEnergy Trading and Marketing Services,

7    LLC, and was created by an agreement between PTMSI Management, Inc. and MNGI.

8    (Separate Vol. Evid., Ex. 7 at 1, 6, 7, 10.)  PTMSI Management, Inc.'s parent company at

9    the time was PanEnergy Corp.  (Id. at 7, 10.)  PanEnergy Corp. was acquired by Duke

10   Energy Corporation in 1997 and PanEnergy Trading and Marketing Services, LLC was

11   renamed to DETM.  (Separate Vol. Evid., Ex. 9 at 2.)  DETM is engaged in the purchase

12   and sale of natural gas and electricity at wholesale.  (DEC Mot., Ex. C at 3.)  DETM

13   concedes personal jurisdiction in this action.  (App. to Pls.' Opp'n to Duke Energy

14   Carolinas, LLC's Mot. to Dismiss for Lack of Pers. Juris (Doc. #1459) ["Heartland App."],

15   Ex. A at 2.)

16        DETM is run by a Management Committee consisting of three representatives

17   from the Duke Energy side and two representatives from the Exxon Mobil side.  (Sealed

18   App., Ex. L at DEMDL000400.)  The Management Committee acts through the delegation

19   of certain responsibilities and authority to the managing member, which in 2001 and 2002

20   was DETMI Management, Inc.  (Id.)  Although DETMI Management, Inc. was the

21   managing member, and through its majority status on the committee could outvote the

22   MNGI members on certain matters, the limited liability company agreement mandated that

23   some actions required unanimous approval by the Management Committee.  (Separate Vol.

24   Evid., Ex. 7 at 17, 24, 26-27.)  In at least one instance, the MNGI members refused to agree

25   to a business plan supported by the DETMI Management, Inc. members.  (Pls.' App., Ex. E

26   at 67-69.)

No DEC director serves as an officer or director for DETM.  (DEC Mot., Ex. A at 4.)  During the 2000 to 2002 time frame, only one DEC officer also served as a DETM officer, and that person did so only for approximately three months.  (DEC Heartland Mot., Ex. E at 3.)  In DEC's 2000 annual report, DEC identified a "management team" which includes Jim W. Mogg ("Mogg"), Chief Executive Officer of Duke Energy Field Services; Kirk B. Michael ("Michael"), Vice President and Chief Financial Officer for Finance and Planning; James Donnell ("Donnell"), President and Chief Executive Officer for Duke Energy North America; and Ronald Green ("Green"), President and Chief Executive Officer for Duke/Fluor Daniel.  (Pls.' App., Ex. B at DEMDL001901.)  Mogg, Michael, Donnell, and Green were members of the DETM Management Committee at one point or another.  (Sealed App., Ex. L at DEMDL001702, DEMDL001706, DEMDL001711.)

DEC and DETM maintain separate corporate records.  (DEC Mot., Ex. A at 4.) DEC provided corporate services to DETM, including administering employee health insurance, human resources, computer technology, legal services, and credit risk management.  (Pls.' App., Ex. A at 4-5.)  Throughout the relevant time period, DETM regularly used, and was permitted to use, the "Duke Energy" and "Mobil" logos.  (Id. at 5.) DETM did not have any agency agreements or power of attorney for DEC, and did not register to do business on DEC's behalf in Missouri during the relevant time period. (Heartland App., Ex. A at 6.)

DETM was financed through a $150 million funding facility, of which DETMI Management, Inc. provided sixty percent and MNGI funded the other forty percent. (Separate Vol. Evid., Ex. 3 at 35.)  In DETM's financial statements, it twice indicated that DEC was responsible for providing operational interest-free contributions, on a proportionate basis with Exxon Mobil, to fund DETM's operations.  (Sealed App., Ex. L at DEMDL00383, DEMDL00400.)  According to Richard McGee ("McGee"), former general counsel for energy services for DEC and current president of DEC's international business,

these statements were a mistake, as PanEnergy Corp., not DEC, is responsible for making contributions under the funding facility agreement.  (Pls.' App., Ex. E at 6, 138-40.)  DEC's consolidated financial reports reflected sixty percent of DETM's profits and losses during the relevant time period.  (Pls.' App., Ex A at 6.)

DEC describes itself, collectively with its subsidiaries, as "an integrated energy and energy services provider with the ability to offer physical delivery and management of both electricity and natural gas throughout the U.S. and abroad."  (Pls.' App., Ex. B at DEMDL001846.)  DEC provides these services through various "business segments," one of which includes DETM's natural gas trading.  (Id.)  DEC describes its business strategy as "develop[ing] integrated energy businesses in targeted regions where Duke Energy's extensive capabilities in developing energy assets, operating electricity, natural gas and NGL plants, optimizing commercial operations and managing risk can provide comprehensive energy solutions for customers and create superior value for shareholders." (Id.)

DEC has created "[c]omprehensive risk management polices" to monitor and manage market, commodity price, credit, and other risks to which DEC and its subsidiaries are exposed.  (Id. at DEMDL001854-55.)  As part of its risk management policies, DEC monitors certain metrics, such as value-at risk ("VAR") and daily earnings at risk ("DER") on a daily basis.  (Id. at DEMDL001855.)  DEC has several committees which perform risk management, including the Corporate Risk Management Committee, the Energy Risk Management Committee, and the Financial Risk Management Committee.  (Pls.' App., Ex. E at 80.)  DEC appointed the members of each of these committees.  (Id.)  Through these polices and committees, DEC sets overall risk guidelines for its subsidiaries.

For example, DEC adopted a Code of Business Ethics which applied to every DEC subsidiary.  (Pls.' App., Ex. J, Ex. E at 100-01.)  This policy mandated compliance with applicable antitrust laws.  (Pls.' App., Ex. J at 12.)  This policy was implemented and

supervised by DEC's Corporate Compliance Committee.  (Id. at 15.)  The Corporate

Compliance Committee was responsible for updating the code, establishing education

programs for employees about ethics and compliance issues, providing guidance under the

code, monitoring and auditing compliance, reporting periodically to management and the

Audit Committee of DEC's Board of Directors, and reporting violations to the appropriate

governmental authorities.  (Id.)  DETM either incorporated this policy by reference or

adopted a similar policy.  (Pls.' App., Ex. E at 115-16.)

DEC also has a Corporate Credit Risk policy.  (Sealed App., Ex. L at

DEMDL001382, DEMDL001388.)  Under this policy, DEC's Chief Risk Officer chairs the

Risk Management Committee.  (Id.)  The Risk Management Committee meets at least

monthly and is responsible for reviewing business trends and credit exposure, monitoring

compliance with the policy, identifying where new policies are needed, and ensuring

"consistent and mutually reinforcing credit and market risk management strategies through

various corporate risk policies and associated guidelines for implementing policy."  (Id.)

The policy also sets forth the duties of the Chief Credit Officer, which includes the ability

to "stop business activity that would increase credit exposure, as is necessary, to protect

Duke Energy's balance sheet."  (Id.)  The Chief Credit Officer reports to the Chief Risk

Officer.  (Id.)

DEC has a Corporate Risk Management Committee consisting of DEC's chief

financial officer and DEC Policy Committee members.  (Id. at DEMDL001488.)  This

Committee establishes "comprehensive risk management policies to monitor and control

identified risks."  (Id.)  DEC's Corporate Risk Management Committee delegates some

responsibilities to the Energy Risk Management Committee and the Financial Risk

Management Committee, but retains oversight responsibilities.  (Id.)  The Energy Risk

Management Committee has responsibility for overseeing energy risk management

practices and recommending energy commodity exposure limits, subject to approval by the

Corporate Risk Management Committee.  (Id.)  The Financial Risk Management Committee is responsible for managing risks related to interest rates, foreign currency, and credit.  (Id.)

Within DETM, "[u]ltimate risk control responsibility resides with the DETM Management Committee."  (Id. at DEMDL001489.)  The DETM Management Committee oversees the risk management and control function and approves policies and controls for DETM.  For example, DETM adopted its own Risk Management and Trading Policies and Controls.  (Id. at DEMDL001484.)  DETM's Management Committee "delegates the day-to-day overview of the risk management and control function" to the DEC Energy Risk Management Committee.  (Id. at DEMDL001489.)  "However, overall responsibility for DETM's performance targets, business plans and approved risk levels remains with the Management Committee."  (Id.)  Although DETM's Risk Management and Trading Policies and Controls states that the Management Committee delegates "day-to-day overview" to the DEC Energy Risk Management Committee, it describes the Energy Risk Management Committee's functions as meeting "at least monthly" to establish risk management policies, controls, and practices, and overseeing and approving excesses of overall limits.  (Id. at DEMDL001489-90.)  When it comes to operational control, the policy vests that authority in DETM Senior Management.  (Id. at DEMDL001490.)  DETM Senior Management is responsible for "[d]evelopment of trading strategies; [a]ctive management of trading within overall limits; [a]llocation of limits to traders and/or books; [e]nforcing the risk control environment; [a]dvocating new limits and products; and [a]dvocating exceptions or revisions to policy when appropriate."  (Id.)  Beneath DETM Senior Management, the origination and trading groups actually conduct the transactions with customers.  (Id.)

DEC's Energy Risk Management Committee is not responsible for managing energy price risk for DETM.  (Separate Vol. Evid., Ex. 10 at DEMDL001569.)  Instead,

DETM manages its own energy price risk pursuant to its own risk management policy.  (Id.)
However, that policy is subject to approval by the Corporate Risk Management Committee.
(Id.)  In similar fashion, DETM decides whether to extend credit, subject to the Financial
Risk Committee's Credit Quality Guidelines.  (Id. at DEMDL001495.)  According to
McGee, DEC's risk management policies "would have applied to DETM only to the extent
that . . . the management committee of DETM had adopted a policy that was similar to this
or [DETMI,] in discharging its responsibilities as a managing member of DETM . . .
adopt[ed] policies that it saw fit in connection with discharging those duties."  (Pls.' App.,
Ex. E at 100.)  These policies "were either largely consistent with or in some cases maybe
identical to some of" DEC's policies.  (Id.)

   At a July 2000 DETM management committee meeting, the MNGI representative
expressed some concern that certain personnel now working for DETM would be shared
between DETM and Duke Energy North America, LLC.  (Sealed App., Ex. L at
DEMDL001707.)  Specifically, the MNGI representative was concerned that because
DETM senior managers "would have dual responsibilities, working for both DETM and
Duke Energy or Duke affiliates, [they] would face conflicts because their compensation is
based on performance of two entities with differing Duke ownership shares."  (Id.)  At a
September 2001 DETM management committee meeting, the Exxon Mobil representative
"objected to the way the business had been run including a perceived lack of separation
between [Duke Energy North America] and DETMI."  (Id. at DEMDL001718.)

   In May 2002, DETM's outside auditor, Deloitte & Touche, sent a letter to the
DETM management committee highlighting certain areas of concern.  (Id. at
DEMDL002687.)  Among the concerns Deloitte & Touche highlighted was that DETM's
operations were "highly integrated into the overall strategy of Duke Energy North America
('DENA').  There are instances where the distinctiveness between DETM and other

///

10

affiliates of its owners could be enhanced."[2]  (Id. at DEMDL002692.)

In September 2003, the Commodity Futures Trading Commission ("CFTC") entered into a settlement with DETM regarding allegations that DETM manipulated the natural gas market.  (DEC Heartland Mot., Ex. G.)  The CFTC found that from January 2000 through August 2002, DETM's Houston office reported to price reporting firms false price and volume information regarding natural gas transactions.  (Id. at 2-3.)  As part of the settlement, DETM agreed to cease and desist from any future violations, and agreed to pay a $28 million fine.  (Id. at 5.)  Additionally, both DETM and Duke Energy Corporation (DEC's predecessor) agreed to cooperate in any future investigations arising out of this investigation, to preserve records, to produce documents when requested, and to provide assistance in locating and contacting any prior employees.  (Id.)  DETM and Duke Energy Corporation also agreed not to publicly deny the CFTC's findings of fact.  (Id. at 6.)  DEC attorneys and senior executives participated in internal investigations into DETM's price reporting activities.  (Pls.' App., Ex. A at 6.)

In April 2003, DEC announced that two of its subsidiaries, Duke Energy North America and Duke Energy Merchants, would cease proprietary trading of natural gas and power.  (DEC Mot., Ex. G.)  DETM also ceased speculative natural gas trading in 2003.  (Pls.' App., Ex. A at 5.)  After that time, DETM continued to buy and sell natural gas "for the purpose of meeting and hedging its obligations to supply gas-fired power plants owned by Duke Energy North America, Inc. and other affiliates and to meet natural gas supply commitments it has made."  (Id.)  By the end of 2004, DEC "made substantial progress on winding down" the DETM joint venture with Exxon Mobil, and had "completed or signed transactions to sell about 90 percent of that business."  (Pls.' App., Ex. G.)

_____

[2]  DEC objects to the admission of the Deloitte & Touche letter as inadmissible hearsay. Because consideration of the letter does not affect the outcome of this decision, the Court will deny DEC's objection.

1    The parties now dispute the significance of these contacts under the Missouri

2    long-arm statute. The parties also dispute whether this Court's exercise of personal

3    jurisdiction over DEC would violate constitutional due process requirements.

4    **II.    PERSONAL JURISDICTION**

5    "When a defendant moves to dismiss for lack of personal jurisdiction, the

6    plaintiff bears the burden of demonstrating that the court has jurisdiction over the

7    defendant." Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154 (9th Cir. 2006).  To meet this

8    burden, a plaintiff must demonstrate that personal jurisdiction over a defendant is (1)

9    permitted under the applicable state's long-arm statute and (2) that the exercise of

10   jurisdiction does not violate federal due process.  Id.  The Court must analyze whether

11   personal jurisdiction exists over each defendant separately.  Harris Rutsky & Co. Ins.

12   Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1130 (9th Cir. 2003).

13   Where the issue is before the Court on a motion to dismiss based on affidavits

14   and discovery materials without an evidentiary hearing, the plaintiff must make "a prima

15   facie showing of facts supporting jurisdiction through its pleadings and affidavits to avoid

16   dismissal." Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114,

17   1119 (9th Cir. 2002).  The Court accepts as true any uncontroverted allegations in the

18   complaint and resolves any conflicts between the facts contained in the parties' evidence in

19   the plaintiff's favor.  Id.  However, for personal jurisdiction purposes, a court "may not

20   assume the truth of allegations in a pleading which are contradicted by affidavit."

21   Alexander v. Circus Circus Enters., Inc., 972 F.2d 261, 262 (9th Cir. 1992) (quotation

22   omitted).

23   In diversity cases such as this, "a federal court applies the personal jurisdiction

24   rules of the forum state provided the exercise of jurisdiction comports with due process."

25   Scott v. Breeland, 792 F.2d 925, 927 (9th Cir. 1986).  However, "federal law is controlling

26   on the issue of due process under the United States Constitution." Data Disc, Inc. v. Sys.

Tech. Assoc., Inc., 557 F.2d 1280, 1286 n.3 (9th Cir. 1977); see also Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1110 (9th Cir. 2002).  Therefore, the Court will apply law from the United States Court of Appeals for the Ninth Circuit in deciding whether jurisdiction is appropriate under the Due Process Clause.  See In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1174 (D.C. Cir. 1987) (concluding that "the transferee court [should] be free to decide a federal claim in the manner it views as correct without deferring to the interpretation of the transferor circuit"); Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) (holding that "a transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit").

       To satisfy federal due process standards, a nonresident defendant must have "minimum contacts" with the forum state so that the assertion of jurisdiction does not offend traditional notions of fair play and substantial justice.  Pebble Beach Co., 453 F.3d at 1155 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 315 (1945)).  A federal district court may exercise either general or specific personal jurisdiction.  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984).

       To establish general personal jurisdiction, the plaintiff must demonstrate the defendant has sufficient contacts to "constitute the kind of continuous and systematic general business contacts that 'approximate physical presence.'"  Glencore Grain, 284 F.3d at 1124 (quoting Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th Cir. 2000), modified, Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1207 (9th Cir. 2006)).  Courts consider such factors as whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there.  Bancroft, 223 F.3d at 1086.  "[A] defendant whose contacts are substantial, continuous, and systematic is subject to a court's general jurisdiction even if the suit concerns matters not arising out of his contacts with the forum."  Glencore Grain, 284 F.3d at 1123 (citing

Helicopteros, 466 U.S. at 415 n.9).

A nonresident defendant's contacts with the forum state may permit the exercise of specific jurisdiction if: (1) the defendant has performed some act or transaction within the forum or purposefully availed himself of the privileges of conducting activities within the forum, (2) the plaintiff's claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction over the defendant is reasonable. Pebble Beach Co., 453 F.3d at 1155-56. "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." Omeluk v. Langsten Slip & Batbyggeri A/S, 52 F.3d 267, 270 (9th Cir. 1995).

Under the first prong of the "minimum contacts test," the plaintiff must establish either that the defendant "(1) purposefully availed himself of the privilege of conducting his activities in the forum, or (2) purposefully directed his activities toward the forum." Pebble Beach Co., 453 F.3d at 1155. "Evidence of availment is typically action taking place in the forum that invokes the benefits and protections of the laws in the forum." Id. Evidence of direction usually consists of conduct taking place outside the forum that the defendant directs at the forum. Id. at 1155-56.

The purposeful direction aspect of the first prong is satisfied when a foreign act is both aimed at and has effect in the forum. Id. In other words, the defendant "must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." Id. To satisfy the third element of this test, the plaintiff must establish the defendant's conduct was "expressly aimed" at the forum; a "mere foreseeable effect" in the forum state is insufficient. Id. The "express aiming" requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct "individually targeting a known forum resident." Bancroft, 223 F.3d at 1087.

///

14

1    The second prong of the specific jurisdiction test requiring that the contacts

2    constituting purposeful availment or purposeful direction give rise to the current action is

3    measured in terms of "but for" causation.  Id. at 1088.  "If the plaintiff establishes both

4    prongs one and two, the defendant must come forward with a 'compelling case' that the

5    exercise of jurisdiction would not be reasonable."  Boschetto v. Hansing, 539 F.3d 1011,

6    1016 (9th Cir. 2008) (quotation omitted).

7    Plaintiffs are not contending this Court may assert personal jurisdiction over

8    DEC based on REI's own contacts with Missouri.  (Pls.' Opp'n to Duke Energy Carolinas,

9    LLC's Mot. to Dismiss for Lack of Pers. Juris. (Doc. #1458) at 3.)  Consequently, DEC is

10   subject to personal jurisdiction in Missouri only if the forum acts of its subsidiary, DETM,

11   are attributable to it through alter ego or agency principles.[3]

12   **A.  Alter Ego**

13   A "parent-subsidiary relationship alone is insufficient to attribute the contacts of

14   the subsidiary to the parent for jurisdictional purposes."  Harris Rutsky & Co. Ins. Servs.,

15   Inc., 328 F.3d at 1134.  However, a subsidiary's contacts may be imputed to its parent for

16   personal jurisdiction purposes where the subsidiary is the parent's alter ego.  Id.

17   To demonstrate a parent and its subsidiary are alter egos, the plaintiff must

18   establish a prima facie case that the two companies share "such unity of interest and

19   ownership" that the companies' separateness no longer exists and "failure to disregard

20   [their separate identities] would result in fraud or injustice."  Doe v. Unocal Corp., 248 F.3d

21   915, 926 (9th Cir. 2001) (quotation omitted).  To demonstrate a unity of interest warranting

22   disregard of corporate separateness, the plaintiff must show the parent controls its

23   subsidiary to such a degree as to render the subsidiary a "mere instrumentality" of its parent.

24   Id. (quotation omitted).  Typically, this would involve showing the parent controls the

25

26        [3]  The Court will assume that if DETM's forum-related acts are attributable to DEC, the
     Missouri long-arm statute is satisfied.

subsidiary's internal affairs or daily operations.  Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir. 1980).[4]

A parent corporation may be involved directly in certain aspects of its wholly owned subsidiary's affairs without subjecting itself to alter ego status.  For example, a parent may provide financing to its subsidiary so long as it maintains corporate formalities and properly documents loans and capital contributions to its subsidiaries, and it may act as its subsidiary's guarantor.  Doe, 248 F.3d at 927-28.  Additionally, a parent may refer to its subsidiaries as divisions of the parent in annual reports.  Id. at 928.  Further, a parent may review and approve major decisions, place its own directors on the subsidiary's board, and share offices and staff with its wholly owned subsidiary without being considered its alter ego.  Id.; Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1135.

In sum, a parent may involve itself directly in its subsidiary's activities without becoming an alter ego "so long as that involvement is consistent with the parent's investor status."  Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1135 (quotation omitted).  Activities consistent with investor status include "'monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and

_____

[4]  Missouri employs a similar alter ego test.  Under Missouri law, "when a corporation is so dominated by a person as to be a mere instrument of that person and is indistinct from the person controlling it, then the court will disregard the corporate form if to retain it would result in injustice."  East Attucks Cmty. Housing, Inc. v. Old Republic Sur. Co., 114 S.W.3d 311, 321-22 (Mo. Ct. App. 2003) (quotation omitted).  The party seeking to pierce the corporate veil must show such "complete domination" that "the corporate entity as to this transaction had at the time no separate mind, will or existence of its own."  Real Estate Investors Four, Inc. v. Am. Design Group Inc., 46 S.W.3d 51, 56 (Mo. Ct. App. 2001) (quotation omitted).  Additionally, the party seeking to pierce must show the corporation used such control to commit a fraud or wrong, to violate statutory or other positive legal duties, or to perpetrate a dishonest and unjust act in contravention of plaintiff's legal rights.  Id. Finally, the party must show "[t]he control and breach of duty" proximately caused the injury.  Id. (quotation omitted).  To the extent Missouri would look to the law of the state of incorporation to determine alter ego status, see In re Bridge Info. Sys., Inc., 325 B.R. 824, 830-31 (Bankr. E.D. Mo. 2005), North Carolina has similar requirements.  See State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 666 S.E.2d 107, 112-15 (N.C. 2008); East Market Street Square, Inc. v. Tycorp Pizza IV, Inc., 625 S.E.2d 191, 196-201 (N.C. Ct. App. 2006).

articulation of general policies and procedures[.]'" Doe, 248 F.3d at 926 (quoting United States v. Bestfoods, 524 U.S. 61, 72 (1998)).

In addition to showing lack of corporate separateness, the plaintiff also must show that failure to disregard the corporate form would promote fraud or injustice. The fraud or injustice must relate to the forming of the corporation or abuse of the corporate form, not a fraud or injustice generally. Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc., 736 F.2d 516, 524-25 n.12 (9th Cir. 1984). For example, undercapitalization at the subsidiary's inception may be evidence of the parent's fraudulent intent. Id. However, a corporation that once was capitalized adequately but "subsequently fell upon bad financial times" does not support a finding of fraud or injustice. Id. at 525. Further, evidence that the corporation existed as an ongoing enterprise engaged in legitimate business suggests no fraudulent intent or injustice to support piercing the corporate veil. Seymour v. Hull & Moreland Eng'g, 605 F.2d 1105, 1113 (9th Cir. 1979). An inability to collect on a judgment "does not, by itself, constitute an inequitable result." Id.

Plaintiffs have failed to establish a prima facie case of personal jurisdiction based on DETM being DEC's alter ego. DEC indirectly owns only sixty percent of DETM. DETM thus is neither DEC's direct subsidiary nor its wholly owned subsidiary. The companies did not share offices and had virtually no overlapping officers or directors. That other officers and directors of other DEC subsidiaries may have overlapped or that DEC identified certain DETM Management Committee members as part of an overall "management team" does not indicate a lack of separateness between DEC and DETM. Likewise, the fact that MNGI and/or Deloitte & Touche perceived a possible lack of separateness between DETM and Duke Energy North America does not establish a lack of separateness between DETM and DEC. Nor does the possibility that DEC was responsible for making contributions under the funding facility or that DEC provided corporate

17

services, such as legal or human resources support.

Plaintiffs have presented no evidence that DEC controlled DETM's daily operations.  Under the limited liability company agreement, DETMI Management, Inc. was the managing agent, not DEC.  And as to DETMI Management, Inc., it did not have complete control over DETM as the MNGI representatives' approval was required for any material decisions.  In at least one instance, DETMI Management, Inc. was unable to implement the business plan it desired because it could not obtain the approval of the MNGI representatives on the Management Committee.

DEC's promulgation of general policies for its subsidiaries is consistent with its indirect investor status.  DEC, as an investor up the corporate chain, is entitled to monitor DETM's performance.  Consequently, any daily reporting of information from DETM to DEC is in accord with DEC's investor oversight role.  No evidence suggests DEC gave daily control commands to DETM or even to DETMI Management, Inc.  Rather, the record demonstrates that, consistent with its investor status, DEC set general policies and guidelines regarding best policies and practices, as well as certain overall limits, such as limits on credit risk.  However, DEC's broad policies applied to DETM only to the extent DETM's Management Committee adopted those policies, in whole or in part, through DETMI Management, Inc.'s status as a majority member.

Moreover, DETM's delegation of certain risk management oversight to DEC's Energy Risk Management Committee does not demonstrate daily control.  The Energy Risk Management Committee meets "at least monthly," and is responsible for establishing risk managing practices and controls, monitoring daily reports, and overseeing and approving any excesses of a risk limit.  (Sealed App., Ex. L at DEMDL001490.)  The Energy Risk Management Committee thus established broad guidelines under which DETM operated and became involved, if ever, only when overall limits were exceeded.  Actual operational decisions, such as developing trading strategy, actively managing trading within overall

limits, allocating limits among traders, and enforcing risk control, were the responsibility of DETM Senior Management.

Further, with respect to DETM's day-to-day conduct of its business within these guidelines, Plaintiffs present no evidence DEC had any role.  For example, with respect to natural gas trading, while DEC set overall limits on certain metrics, DEC had no role in making the day-to-day decisions of who DETM was to trade with, when, for what amount of natural gas, and at what price.  Plaintiffs also present no evidence DEC had any role in DETM's price reporting to indices.  Plaintiffs present evidence that DEC policies granted DEC's chief credit officer with veto power over any DETM business activity, but Plaintiffs present no evidence that authority ever was exercised over DETM generally or particularly with respect to any natural gas trades in Missouri or anywhere else.

Even if Plaintiffs had established a lack of corporate separateness, Plaintiffs have not established a fraud or injustice would result if the Court failed to pierce the corporate veil.  Plaintiffs contend it would be unjust to permit DEC to reap the benefits of DETM's alleged unlawful behavior by enjoying profits from DETM's trading activities while escaping liability for DETM's alleged misconduct.  However, the alleged illegal price manipulation cannot itself constitute the fraud or injustice necessary to pierce the corporate veil.  Rather, DEC must have had some fraudulent intent at DETM's inception or some later abuse of the corporate form such that failing to treat the entities as one would be inequitable.  Plaintiffs present no evidence DETM was undercapitalized at its inception. DEC was not involved in forming DETM and became its indirect parent through DEC's acquisition of DETM's ultimate parent, PanEnergy Corp.  Further, the fact that DETM operated as a legitimate business for years suggests a lack of fraudulent intent or perpetration of a fraud through use of the corporate structure on the parent's part.

///

///

Plaintiffs' fear that they may not be able to collect on a judgment in this action against DETM does not constitute fraud or injustice to support piercing the corporate veil. The Court therefore finds Plaintiffs have not met their burden of establishing DETM is DEC's alter ego, and the Court will not attribute DETM's contacts with Missouri to DEC for purposes of determining personal jurisdiction based on alter ego principles.

**B. Agency**

A subsidiary's contacts also may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's general agent in the forum. Harris Rutsky & Co. Ins. Servs., Inc., 328 F.3d at 1134. A subsidiary is its parent's agent for purposes of attributing its forum-related contacts to the parent if the subsidiary "performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'" Doe, 248 F.3d at 928 (quoting Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994)). The ultimate inquiry is whether the subsidiary's presence in the forum "substitutes" for its parent's presence. Id. at 928-29 (quotation omitted).

Where the parent is merely a holding company, the subsidiary's forum-related contacts are not done as the parent's agent because the holding company "could simply hold another type of subsidiary" as an investment and thus the subsidiary conducts business not as the parent's agent but as its investment. Id. at 929. "Where, on the other hand, the subsidiaries are created by the parent, for tax or corporate finance purposes, there is no basis for distinguishing between the business of the parent and the business of the subsidiaries." Id. (quotation omitted). The inquiry as to whether a subsidiary is its parent's general agent in the forum is "a pragmatic one." Gallagher v. Mazda Motor of Am., Inc., 781 F. Supp. 1079, 1085 n.10 (E.D. Pa. 1992).

///

///

For example, where a Japanese parent company was engaged in the manufacture of watches, its subsidiaries that acted as its sole sales agents in America were "almost by definition . . . doing for their parent what their parent would otherwise have to do on its own." Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd., 508 F. Supp. 1322, 1342 (E.D.N.Y. 1981). The Bulova court thus attributed the subsidiaries' contacts to the parent company. Id.; see also Chan, 39 F.3d at 1405-06 (remanding to the district court for additional findings of fact regarding agency where the German parent corporation owned and operated cruise ships and its local subsidiary marketed cruises and chartered cruise ships and sold the cruise ticket to the plaintiffs out of which the claims arose); Modesto City Schs. v. Riso Kagaku Corp., 157 F. Supp. 2d 1128, 1135 (E.D. Cal. 2001) (holding subsidiary was parent's agent for personal jurisdiction purposes where subsidiary acted as sole conduit for marketing and selling parent's products in the United States).

In contrast, where the parent company owned a subsidiary mining company's stock but did not itself engage in the business of gold mining, imputing the subsidiary's forum contacts to the parent was not appropriate. Sonora Diamond Corp. v. Superior Court, 99 Cal. Rptr. 2d 824, 840-41 (Ct. App. 2000). As the Sonora Diamond court explained, had the parent company owned "the rights to the gold and used Sonora Mining as the operating and marketing entity," then perhaps general jurisdiction over the parent company would be appropriate because under those circumstances the parent company "could not reap the benefits of its rights unless it or someone else removed and sold the ore." Id. But where the parent simply held the mining company as an investment, the subsidiary's forum-related contacts could not be imputed to the parent company. Id.

Likewise, in Doe, the Ninth Circuit concluded a foreign company's subsidiaries were not its general agents in California because the plaintiffs presented no evidence that in the absence of the California subsidiaries' involvement in petrochemical and chemical operations, the parent would have conducted and controlled those operations. Doe, 248

F.3d at 929.  The Court reached this conclusion even though the parent company issued consolidated reporting, referred to a subsidiary in an annual report as its "US unit," and stated that use of the subsidiary "would enable it to expand its marketing network and produce higher value-added specialty products in the United States."  Id.

Plaintiffs have failed to establish a prima facie case that DETM was DEC's general agent in Missouri.  DEC's primary business is the generation and supply of electricity to end users in North and South Carolina.  DEC also acts as a holding company, but it is not purely a holding company in the sense that it does not passively hold stock in companies from an unrelated range of businesses.  DEC has described itself as a "an integrated energy and energy services provider with the ability to offer physical delivery and management of both electricity and natural gas throughout the U.S. and abroad."  (Pls.' App., Ex. B at DEMDL001846.)

In practice, DEC itself does not perform these activities beyond the generation and transmission of electricity in North and South Carolina, but holds the shares of various subsidiaries which either engage in those activities or which in turn own subsidiaries which perform those business operations.  Among these business operations was DEC's North American Wholesale Energy business segment, which included DETM's natural gas-related activities.  (Id.)

Although DEC identifies natural gas trading and marketing as one of its business segments, Plaintiffs have not established that DETM's sales of natural gas in Missouri were sufficiently important to DEC that if DETM did not make the sales in Missouri, DEC would have done so itself.  DEC's primary business was electricity generation and transmission in North and South Carolina.  Natural gas trading activity was a separate, fragmented component of one of DEC's other business segments operated through an indirect, partially owned subsidiary.  Further, the fact that DETM subsequently ceased natural gas trading in 2003 suggests that DETM's trading activities were not sufficiently important to DEC that it

would perform the activities itself if DETM did not do so on its behalf.

Moreover, Plaintiffs have presented no evidence that DETM's natural gas sales in Missouri in particular were sufficiently important to DEC's business that DEC would have performed the sales in Missouri itself absent its subsidiary's representation in the forum. See Modesto City Schs., 157 F. Supp. 2d at 1135 (noting twenty percent of parent's products were sold through subsidiary which acted as parent's "sole conduit for marketing and selling its products in the United States"); Bulova Watch Co., Inc., 508 F. Supp. at 1344 (noting that sixty percent of parent's products were sold as exports and the United States was the parent company's largest export market through its New York subsidiaries' sales in the United States). Consequently, Plaintiffs have not shown that DETM's Missouri natural gas sales played a significant role in DEC's "'organizational life'" such that it acted as a substitute for DEC in the forum.[5] Bulova Watch Co., Inc., 508 F. Supp. at 1344. The Court therefore will not attribute DETM's Missouri contacts to DEC for personal jurisdiction purposes based on agency principles.

### C. Request for Deferred Decision

Plaintiffs suggest that because the personal jurisdiction question is intertwined with the merits, the Court should defer ruling on the personal jurisdiction issue until after

---

[5] The result would be the same under general Missouri agency law. In Missouri, an agency relationship, whether actual or apparent, exists when "the credible facts, taken as a whole, fairly disclose that a party is acting for or is representing another by the latter's authority." Motorsport Mktg., Inc. v. Wiedmaier, Inc., 195 S.W.3d 492, 498 (Mo. Ct. App. 2006) (quotation omitted). An agent has apparent authority when (1) the principal has manifested his consent to the agent exercising such authority or knowingly permitted the agent to exercise such authority; (2) a third person acting in good faith, "had reason to believe, and actually believed, the agent possessed such authority;" and (3) the third person "relying on the appearance of authority changed his position and will be injured or suffer loss if the transaction executed by the agent does not bind the principal." Id. (quotation omitted). Plaintiffs present no evidence of any manifestation by DEC to DETM that DETM may act on DEC's account. Although Plaintiffs have presented evidence DEC permitted DETM to market natural gas using the "Duke Energy" name and logo, Plaintiffs have not presented any evidence that any third party relied on an apparent agency between DEC and DETM.

merits discovery is completed.  Plaintiffs rely on Data Disc, Inc., 557 F.2d at 1285 n.2.

However, Data Disc, Inc. states that where the jurisdictional issues are intertwined with the

merits, the Court may require the plaintiff to establish "only . . . a prima facie showing of

jurisdictional facts with affidavits and perhaps discovery materials."  Id.  As the Court is

considering the personal jurisdiction issue on the basis of affidavits and documentary

evidence without holding an evidentiary hearing, the Court is following Data Disc, Inc. by

holding Plaintiffs to this standard, and is not requiring Plaintiffs to meet the higher burden

of demonstrating personal jurisdiction by a preponderance of the evidence, as Plaintiffs

would have to do at an evidentiary hearing or at trial.  Id.

Moreover, Plaintiffs have not convinced the Court that further discovery would

produce a different result.  DEC provided Plaintiffs with every DEC document which DEC

provided to the CFTC in conjunction with the CFTC's investigation of DETM's natural gas

trading activity in the relevant time period.  (Mem. of Defs. Duke Energy Carolinas, LLC &

Duke Energy Trading & Marketing, LLC in Opp'n to Pls.' Mot. to Compel Disc. (Doc.

#935) ["Opp'n to Mot. Compel"], Ex. B at 2; Tr. of Proceedings (Doc. #1138) at 55.)  The

documents provided to the CFTC consisted almost entirely of DETM documents.  (Opp'n

to Mot. Compel, Ex. B at 2; Tr. of Proceedings at 55.)  The only DEC documents consisted

of general risk management policies and board of director meeting minutes, which DEC has

provided to Plaintiffs.  (Opp'n to Mot. Compel, Ex. B at 2; Tr. of Proceedings at 55-56.)

The Court therefore will decline Plaintiffs' request to defer the personal jurisdiction issue to

be resolved with the merits.

The Court will not attribute DETM's contacts with the forum to DEC, and DEC

has no contacts of its own sufficient to support personal jurisdiction.  The Court therefore

will grant DEC's motion to dismiss for lack of personal jurisdiction.

///

///

**III.**      **CONCLUSION**

IT IS THEREFORE ORDERED that Defendant Duke Energy Carolinas, LLC's Motion to Dismiss Plaintiffs' Amended Complaint for Damages for Lack of Personal Jurisdiction (Doc. #1299) is hereby GRANTED.  Defendant Duke Energy Carolinas, LLC is hereby dismissed as a defendant in this action for lack of personal jurisdiction.


DATED: February 23, 2009

_____
PHILIP M. PRO
United States District Judge